Oasby, Cli. J.,
dissenting :
Differing with my brethren in their construction of the act of 12th March, 1863, I am compelled to enter my dissent. I do not think that Congress intended to postpone the right to commence a suit for the proceeds of the property sold until after the suppression of the rebellion, hut to limit the right to bring it more than two years after the happening of that event. Many considerations of public policy and expediency occur to me in favor of such an interpretation, as well as against that adopted by the majority.
This act of .12th March, 1863, is evidently in pari matería with that of the 17th July, 1862, entitled “An act to suppress insurrection, to punish treason and rebellion, to seize and confiscate the property of rebels, and for other purposes.”
The fifth section of that act made it the duty of the President of the United States “to cause the seizure of all the estate and property, money, stocks, credits, and effects of the persons hereinafter named in this section, and to apply and use the same, and the proceeds thereof, for the support of the army of the United States.”
The eighth section of that act also provided that, “ to secure the condemnation and sale of any such property after the same shall have been seized, so that it may be made available for the purpose aforesaid, proceedings in rem shall be instituted in the name of the United States, in any district court thereof, &c., in which the property above described, or any part thereof, may he found, into which the same, if movable, may first be brought; which proceedings shall conform as nearly as may be to proceedings in admiralty or revenue cases; and if said property, whether real or personal, shall be found to have belonged to a person engaged in rebellion, or who has given aid or comfort thereto, the same shall be condemned as enemy's property, and become the property of the United States, and may be disposed of as the court shall decree, and the proceeds thereof paid into the treasury of the United States for the purposes aforesaid.” The act made no provision for the appointment of any persons by the President, or any other officer, to take charge of the execution of the provisions of this act. He could only *583 do so in the insurrectionary districts where the civil power of the United States had been suppressed or displaced by the army. And there being no courts of the United States in such districts where proceedings could be had for the condemnation of such property, it had to be transported great distances at much expense and inconvenience before it could be brought within the jurisdiction of a court competent to try and decide the question. The care and charge of this captured and abandoned property was found to affect injuriously the discipline and efficiency of the army. It excited sometimes the cupidity of the army, and became the source of demoralization to it, and of frauds upon the government. It was mainly to correct the abuses and remedy the evils growing out of the act of 17th July, 1862, that this act of 12th March, 1863, was enacted.
This statute, so far as regards the custody and disposal of captured and abandoned property, supersedes and repeals that of 1862. It imposes that duty upon a civil officer appointed by the Secretary of .the Treasury. The property, where it is suitable for the purpose, and needed, is appraised and applied to the use of the army. In other cases it is directed to be sold, and the proceeds paid into the treasury of the United States. The Court of Claims is substituted for the courts designated in the former law, and the expense and inconvenience of a prior condemnation are obviated by substituting the proceeds for the property, and allowing the right to be tested and established on the same principles.
Under the act of 1862, when the prpperty was libelled in the proper-court, the owner could come in and prove his ownership and his fidelity to the government and laws of the United States, and his property was restored to him at once. And such, in my judgment, is the meaning and intention of the law under discussion. Whenever the proceeds are paid into the, treasury he may bring his suit, for his action then accrues, and by proving his ownership of the property, and that “ he has never given any aid or comfort to the present rebellion,” he will be entitled to the residue of the proceeds after deducting costs and charges.
The object of the law was to punish rebels and protect loyal citizens. It is no part of the policy of the law to confiscate the property of persons who have remained true to the government, but it was mainly for the benefit of such that the resort to this court was allowed. And to make their right dependent upon the suppression of the rebellion, or postpone it until that event occurs, appears to me alike impolitic and *584 unjust, and not to be adopted as the true construction, unless tbe terms used by Congress absolutely require us to give them that interpretation. In my opinion, the terms employed in the act not only do not require us to give them such a definition and application, but are not susceptible of being so construed and applied. There are two points of time fixed between which the suit may be instituted. These are, the instant when the proceeds are paid into the treasury, and the end of two years after the suppression of the rebellion. The suit may be instituted “ at any time ” between these two periods.
Congress expected that large sums would come into the treasury from this ‘source, and it is a matter of some importance, as well to the government as to the claimants, that whatever claims are to be made upon the proceeds of such property should be preferred at an early day.
It has been suggested that, by postponing the right of action, Congress intended “ to take security from the owners against future ingratitude.” The policy of such a course might well be doubted ; and its justice would not commend it to the favorable consideration of a judicial tribunal. From those who, in the insurrectionary States, had remained true and loyal to the government through the darkness and dangers of 1861 and 1862, it was as unnecessary to take security in 1863 as it would have been ungenerous to ask it. Few men in any age or country have suffered and sacrificed more than the true Union men of the seceded States since this rebellion commenced. Being few in numbers makes their merit, and the consideration to which they are entitled, the greater. I place my construction, however, upon what I believe to be the meaning and purport of the words of the statute. I do not think they mean, or were intended to mean, that no claim should be preferred until after the rebellion should be suppressed ; but to limit the time, by a reference to that event, beyond' which the government would not agree to respond to such a claim on the part of owners.
The suggestion that-this case comes within the act of the 4th July, 1864, restricting the jurisdiction of this court, cannot be maintained.
That act takes away our jurisdiction in cases “ growing out of the destruction or appropriation of, or damage to, the property by the army or navy, or any part of the army or navy, engaged in the suppression of the rebellion, from the commencement to the close thereof.” This case comes within none of the enumerations of this statute. Nor is it at all affected by it. Upon all the grounds taken, I would be in favor of sustaining the right of action and overruling the motion to dismiss.